FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUL 07 2009

P.M.
TIME A.M. ___

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

JEROME HOWELL,

                 Petitioner,

     – against –

BRIAN FISHER, Superintendent of the
Sing Sing Correctional Facility,

                 Respondent.

------------------------------------------------------------- x

**MEMORANDUM and ORDER**

05-CV-5216 (SLT)(RLM)

**TOWNES, United States District Judge:**

        In June 2000, petitioner Jerome Howell was convicted in the Supreme Court of the State

of New York, Kings County, of murder in the second degree in connection with the shooting

death of one Kenneth Baker. In 2005, after exhausting his direct appeal, petitioner commenced

this action by filing a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

That petition, which initially raised a single issue relating to the court's charge on the causation

element of the murder charge, was subsequently amended to allege ineffective assistance of both

trial and appellate counsel. For the reasons set forth below, the instant petition for a writ of

habeas corpus is denied, and this action is dismissed.

*BACKGROUND*

        At approximately 11:30 p.m. on April 8, 1999, Kenneth Baker was shot several times in

the vicinity of Washington Walk – a walkway which runs through the Walt Whitman Houses in

Fort Greene, Brooklyn. A New York City Police Detective, Andre Parker, was assigned to the

case and was soon informed by Baker's relatives that petitioner, Jerome Howell, was the

perpetrator. Using a computer, Detective Parker located a photograph of petitioner and

constructed a photo array, which he showed to two eyewitnesses to the shooting: Aja Murray

and Tiffany Hayward. Both of the witnesses identified petitioner as the shooter and told Parker that his nickname was "Rome."

Although both identifications occurred within a month of the shooting, Parker was unable to locate petitioner until mid-June 1999, when he learned from petitioner's relatives that petitioner was in North Carolina. Parker arranged for petitioner to be arrested in Whitesville, North Carolina, on June 21, 1999, and questioned petitioner at the Whitesville sheriff's office shortly after the arrest. Petitioner initially denied being Jerome Howell but soon confessed to the shooting, telling Parker that he had deliberately shot Baker once in the leg after fighting with him earlier than night. However, petitioner denied having deliberately fired any other shots, claiming that "[b]ecause he was drunk he fell onto [Baker] and the gun kept going off" (H. 27).[1]

Petitioner waived extradition and returned with Parker to New York, where he was ultimately indicted on several charges, including murder in the second degree in violation of New York Penal Law § 125.25(1) and criminal possession of a weapon in the second and third degrees. Prior to the start of trial, petitioner's trial counsel made several motions, including various suppression motions and a *Sandoval* motion to limit the crimes and other bad acts with which petitioner could be impeached if he were to testify at trial. As a result of counsel's efforts, petitioner was granted a *Dunaway-Wade-Huntley* hearing and a *Sandoval* hearing.

Petitioner's suppression hearing was held May 22, 2000, the day before the start of petitioner's trial. At that hearing, petitioner's trial counsel conducted a thorough cross-

---

[1]Numbers in parentheses preceded by "H" refer to page numbers in the transcript of the May 22, 2000, pre-trial hearing before Justice Joseph Silverman. Numbers in parentheses preceded by "V" refer to pages in transcript of the Voir Dire conducted May 23, 2000; numbers preceded by "T" refer to pages in the trial transcript, and numbers preceded by "S" refer to pages in the transcript of the June 19, 2000, sentencing.

examination of Detective Parker – the sole witness presented by the prosecution – and made a lengthy argument in favor of suppression. That argument proved unsuccessful, with Justice Silverman denying the suppression motion in its entirety.

The *Sandoval* hearing was conducted immediately prior to the start of jury selection on May 23, 2000. At that hearing, the prosecutor noted that petitioner had been arrested ten times – mostly for theft of services or possession of marijuana – and had received youthful offender treatment after pleading guilty to two 1995 indictments charging him with criminal sale of a controlled substance in the third degree. The prosecution sought to question petitioner only about these two drug convictions, saying, "I would at least like to ask him whether or not he received youthful offender treatment for a felony on those cases" (V. 4). After defense counsel protested that "youthful offender treatment is an adjudication ... [,] not a crime" (V. 4), the Court effected a compromise, ruling that, if petitioner elected to testify, the prosecution could ask him if he "ever pled guilty to certain acts which would have been a felony if he had been an adult" (V. 5).

### The Trial

#### The Prosecution Case

Although a dozen witnesses testified during the course of petitioner's weeklong trial, only four of the witnesses claimed to be eyewitnesses to the events of April 8, 1999. Moreover, only two of the four – Shermaine Laster and Joann St. Louis – claimed to have actually witnessed the shooting. The other two eyewitnesses – Aja Murray and Candice Lomax – testified solely about events preceding the shooting.

Murray testified that the incident began sometime in the afternoon on April 8, while Murray, St. Louis and Tiffany Hayward – all of whom were teenagers – were walking with

3

Baker on Myrtle Avenue in the vicinity of Washington Walk (T. 227-28). Petitioner approached on his bicycle and attempted to engage Murray in conversation, asking her name (T. 228-29). Murray initially ignored petitioner, then rebuffed him by laughing at him and telling him that he looked like her uncle (T. 228). According to Murray, her comments "upset" petitioner, who accused her of "trying to play" him and turned his attention to St. Louis (T. 228-29). However, when petitioner began talking to St. Louis, Baker told petitioner to leave the girls alone, saying that they were with him (T. 229).

Petitioner left but resumed his attempts to converse with the girls later that afternoon, when Murray, St. Louis and Hayward were seated on a bench in front of 140 Washington Walk. Although St. Louis did not testify about the events on Myrtle Avenue, St. Louis and Murray gave largely consistent accounts of what transpired following petitioner's return. According to both girls, petitioner initially attempted to converse with them (Murray: T. 231; St. Louis: T. 299). When the girls proved unreceptive, petitioner became "fresh" or insulting, ultimately pushing Murray's head and, according to St. Louis, throwing a gum wrapper at Murray (*Id.*). Petitioner also cursed at the girls and threatened them, claiming that he was a "black mafioso" (Murray: T. 233; St. Louis: T. 299) and that he "own[ed] the projects" (Murray: T. 233).

Petitioner then rode away on his bicycle, only to return on foot sometime later (Murray: T. 233; St. Louis: T. 301). He began "bothering" or cursing at Baker, who was sitting with some friends on a bench right behind Murray and St. Louis (Murray: T. 233-34; St. Louis: T. 302). Shortly thereafter, petitioner and Baker began fighting (Murray: T. 234; St. Louis: T. 302).

The fight was witnessed not only by Murray and St. Louis, but by another teenager, Candice Lomax. Lomax, who was Baker's cousin, saw petitioner every day and knew him well

4

enough to greet him (Lomax: T. 252). In contrast, neither Murray nor St. Louis knew petitioner prior to April 8, 1999 (Murray: T. 227: St. Louis: T. 298, 316), and only Murray was able to identify petitioner at trial (Murray: T. 228). St. Louis was unable to identify petitioner other than to say that she had heard his friends refer to him as "Rome" (T. 298, 314-15, 322).

At trial, Murray, St. Louis and Lomax provided slightly different descriptions of the fight. Lomax testified that the two men were "wrestling" but she did not see them throwing punches (T. 253). Murray and St. Louis, on the other hand, both described a fistfight, testifying that they saw the men punching or hitting one another (Murray: T. 235-36; St. Louis : T. 302). However, all three girls agreed that Baker won the fight; Lomax recalled seeing Baker "on top of" petitioner (T. 253), and both Murray and St. Louis testified that Baker "beat up" petitioner (Murray: T. 235: St. Louis: T. 302).

After a third party named Andre or "Dre" stopped the fight, petitioner stormed away, cursing and shouting (Murray: T. 236-37; Lomax: T. 253-54; St. Louis: T. 302-03). Although the witnesses differed slightly in their recollections of precisely what petitioner said, all three testified that petitioner either stated or implied that he would return to seek revenge. St. Louis remembered that petitioner made "threats," saying, "[F]uck all you all, I'm coming back, I'll be back" (T. 303). Lomax testified that petitioner said, "[F]uck that," and that he was going to get his gun (T. 254), while Murray recalled petitioner saying, "[F]uck this shit, I'm going to get my gun, my brother" (T. 236).

Only two of the three girls – Lomax and St. Louis – claimed to have remained outside to see what happened next. However, Lomax's testimony concerning the subsequent events differed substantially from St. Louis's account, and St. Louis's testimony was contradicted in important respects by Murray's account.

Lomax testified that petitioner returned to Washington Walk about five minutes after the fight with Baker, holding a gun in the air. According to Lomax, "somebody stopped him" and "took the gun from him," saying something "like, Rome, what you doing, chill, chill" (T. 254, 256). Lomax immediately fled the scene and never even heard the gunshots (T. 256-57).

St. Louis testified that she was sitting on a bench with Murray when she saw Baker coming toward them, and heard someone say, "[W]atch your back" (T. 304, 308). St. Louis looked in Baker's direction and saw "Rome" dismount his bicycle and throw it to the ground (T. 308). "Rome" was accompanied by another man, and both men were wielding guns (T. 304-05, 308). As Baker began to turn toward the men, "Rome" opened fire (T. 304, 308). St. Louis claimed that she actually saw Baker "getting shot up" before she and Murray fled into a building (T. 304, 309).

St. Louis testified that she heard five or more gunshots as she and Murray ran upstairs and down a hallway (T. 304, 309). Eventually, she and Murray reached a bathroom, the window of which afforded a view of the crime scene (T. 304). From that window, St. Louis saw Baker writhing on the ground (T. 310-11). St. Louis immediately returned to Washington Walk, arriving before the police came (T. 311), but was unsure whether she waited until the ambulance arrived before going back upstairs (T. 311).

Murray contradicted St. Louis's account by testifying that she, Murray, had gone upstairs approximately 10 to 15 minutes before the shooting occurred (T. 237). Murray claimed that she heard eight or nine gunshots, and that Baker was already lying on the ground by the time she looked out the window (T. 237). Murray did not claim to have witnessed the shooting, and testified that she did not go outside until St. Louis "came upstairs and said, he came back, he shot Kenny" (T. 238).

6

St. Louis's account of the shooting was also inconsistent with that of Shermaine Laster, a 24-year-old former schoolmate of petitioner's brother, Adrian Howell (T. 53-54). Laster testified that, as he was leaving his girlfriend's apartment in the Walt Whitman Houses on the night of April 8, 1999, he saw petitioner and Baker, both of whom he had known for years (T. 54-55, 59, 65-66). According to Laster, petitioner was riding his bicycle through the projects when he "noticed" Baker and several of his friends approaching from Myrtle Avenue (T. 59-60). At that point, petitioner rode toward the building which Laster knew to be petitioner's home, from which he emerged soon thereafter in the company of his brother, Adrian (T. 59-60). Petitioner then approached Baker and began shooting at him (T. 59, 62).

Baker immediately began running around, attempting to dodge the bullets, while petitioner pursued him, "shooting wild[ly]" (T. 59, 63, 88). Eventually, one of the shots struck Baker, causing him to fall to the ground (T. 63, 64). At that juncture, a bystander named Kawsheen grabbed Adrian by the arm and urged him to intervene (T. 61). Adrian not only refused to do so, but pointed a gun at Kawsheen and others and said, "[A]in't nobody doing nothing to my brother," or words to that effect (T. 61, 88). Petitioner then ran up to Baker and fired additional shots at him as he attempted to crawl away (T. 63, 64). Petitioner and his brother then fled the scene (T. 63).

Although Laster testified that he had known Baker "since he was . . . little" (T. 65) and had "grow[n] fond" of him (T. 69), Laster did not approach the fallen Baker or remain at the scene to talk to the police (T. 69, 73). Laster eventually told the police that he had witnessed the shooting, but only sometime in late August 1999, after Laster had been arrested in connection with the July 28, 1999, shooting of one Ricky McCloud (T. 58, 92-94, 118). On direct examination, Laster testified that he made a deal with the prosecution, agreeing to testify against

7

petitioner in exchange for the promise that he would be sentenced to four years, rather than seven years, in prison upon his plea to a charge relating to the McCloud shooting (T. 56).

On cross-examination, defense counsel questioned Laster extensively concerning the terms of Laster's cooperation agreement and his failure to volunteer information to the police. Although Laster insisted that he had telephoned the police with an anonymous tip sometime after the Baker shooting (T. 93, 105), he conceded that he had not agreed to cooperate with the police until his own defense counsel suggested "that it would be a good idea to testify" (T. 98). Defense counsel introduced the cooperation agreement into evidence, and established that the prosecution would recommend 15 – not 7 – years' imprisonment if Laster violated the agreement (T. 101).

Detective Parker introduced the statements which petitioner made shortly after his June 21, 1999, arrest in North Carolina. Parker recounted how he had read petitioner the *Miranda* warnings, then summarized petitioner's statement as follows:

> He basically stated that as a result of a physical confrontation, he went back, got a firearm, came back[,] shot [Baker] one time in the leg, fell on the victim at which time the gun repeatedly went off and he fled the scene (T. 141).

On cross-examination, defense counsel managed to elicit details concerning petitioner's statements which were not recorded on the audiotape or in Parker's handwritten synopsis. Notably, Parker testified that petitioner twice said that the shooting was not his fault, implying that his brother made him do it (T. 150).

Defense counsel made attempts throughout trial to corroborate petitioner's claim that he had been intoxicated at the time of the shooting. For example, he cross-examined Murray about whether petitioner was drunk at the time of the shooting, and succeeded in adducing testimony that Murray saw a marijuana cigarette tucked behind petitioner's ear and "thought maybe he was

8

high off of weed" (T. 244). In addition, defense counsel elicited testimony that St. Louis "smelled alcohol on [petitioner's] breath and also weed," and that St. Louis saw petitioner smoking and drinking prior to the fight with Baker (T. 316, 319). However, this evidence of petitioner's possible intoxication was undercut by Laster's testimony that petitioner was riding his bicycle "perfectly fine" just prior to the shooting (T. 117).

While there was some evidence to support petitioner's claim of intoxication, there was ample evidence to rebut petitioner's claim that the gun had discharged accidently. Police Officer Brian Lowney testified that he recovered eight .9 millimeter shell casings from the crime scene (T. 263). A ballistics expert, Joseph Ramirez testified that all eight shells had been fired from a Glock pistol, which had been recovered on March 22, 2000, during the arrest of one Tyrone Hill (T. 198, 201). Ramirez explained that the Glock was not an automatic, but a semi-automatic, weapon and would not fire multiple rounds unless the trigger was slightly released and then depressed before each shot (T. 198, 204).

Ramirez could not say whether a lead bullet fragment recovered from Baker's body was fired from the Glock (T. 197). However, Dr. Jesse Blumenthal, the surgeon who operated on Baker shortly after the shooting, and Dr. Henry Nields, the medical examiner who performed the autopsy on Baker's body, both testified that Baker had suffered multiple gunshot wounds (Blumenthal: T. 218-20; Nields: T. 171-73). One of the gunshots perforated portions of Baker's large intestine, and caused Baker to develop a fatal infection (Blumenthal: T. 220-23). Drs. Blumenthal and Nields both testified that the sepsis which caused Baker's death resulted from the gunshot wounds (Blumenthal: T. 223; Nields: T. 167, 176).[2]

---

[2]The prosecution called three witnesses other than those whose testimony is described above: Police Officer Tony Smith, one of the first police officers to arrive at the scene; Edison Gavilanes, a paramedic who treated Baker shortly after the shooting; and Baker's aunt, Lasurma Pippins, who identified Baker's body.

### *The Defense Case*

Following the close of the People's case, and after defense counsel moved unsuccessfully to dismiss all counts for failure to prove a prima facie case, defense counsel moved to recall Parker. Defense counsel explained that he wanted Parker (1) to clarify that St. Louis had not only failed to identify petitioner at the lineup, but had identified someone else, and (2) to testify that St. Louis had never told Parker that the shooter's name was "Rome." Judge Silverman persuaded the prosecution to stipulate to the misidentification, and ruled that St. Louis's failure to tell Parker the shooter's nickname was irrelevant (T. 364-65).

Petitioner did not to testify at trial. After defense counsel announced, outside the presence of the jury, that he would not be calling any witnesses, Judge Silverman questioned petitioner as follows:

| | |
|---|---|
| THE COURT: | Mr. Howell, did you discuss your right to testify with [defense counsel]? |
| MR. HOWELL: | Yes. |
| THE COURT: | And after discussing with him your right to testify, you have agreed not to testify? |
| MR. HOWELL: | Yes. |
| THE COURT: | Anybody force you into not testifying? |
| MR. HOWELL: | No (T. 366). |

After this colloquy, the jurors returned to the courtroom and the defense rested on the record (T. 367).

### *The Charge Conference, Summations, and Verdict*

At the charge conference, defense counsel requested, and was granted, a charge on intoxication (T. 368-69). In addition, Judge Silverman agreed to charge the jury on extreme

emotional disturbance and two lesser included offenses: manslaughter in the first degree, under the theory that petitioner committed an intentional murder while under the influence of an extreme emotional disturbance (N.Y. Penal Law § 125.20(2)), and manslaughter in the second degree, under the theory that petitioner had recklessly, and not intentionally, caused the death of Baker (N.Y. Penal Law §125.15(1)).

Although defense counsel had requested the intoxication charge, defense counsel's summation did not seek to mitigate petitioner's responsibility for the crime. Rather, defense counsel argued strenuously for acquittal on the theory that the People had failed to prove petitioner's guilt beyond a reasonable doubt. First, defense counsel argued that petitioner's statements were neither voluntary nor truthful. He questioned why someone who fled all the way to North Carolina would confess so quickly and asserted that the statements attributed to petitioner made "no sense at all compared to the evidence in this case" (T. 387).

Defense counsel then analyzed the testimony of each of the four witnesses to the events of April 8, 1999. First, he pointed out that Laster was the only witness who identified petitioner as the shooter (T. 392), noting that Lomax testified that petitioner was disarmed before he fired a shot (T. 394); that Murray was upstairs at the time of the shooting (T. 395); and that St. Louis had identified someone other than petitioner at the lineup (T. 396). Defense counsel then characterized Laster's testimony as "bought and paid for" (T. 388), arguing that Laster inculpated petitioner solely to obtain a favorable disposition in his own case. Defense counsel dismissed the fact that Laster had cried "like a baby" on the stand as an act calculated to "sell" concocted testimony (T. 391). Defense counsel also noted that Laster had not cooperated with the police in this case until Laster himself was arrested on unrelated charges, and rebutted the

implication that Laster was concerned for his safety by noting that Laster was not in protective custody (T. 388-91).

In response to defense counsel's attacks on Laster, the prosecutor questioned whether either he or defense counsel – "two white males in suits" – could properly understand Laster's motivations. The prosecutor stated:

> I submit to you that there was no act going on up there when he [Laster] was testifying. He was testifying about Kenneth Baker, Jr. This was a kid he knew. Based upon the way he testified and what he testified to, it was clear that he had a fondness for this kid Kenny, it's clear that he loved this kid. It's easy to sit here in the cold of the courtroom, 13 months later, two white males in suits talking about Shermaine Laster from the Walt Whitman Houses. Ironic isn't the word. There was another word I was looking for, how ridiculous is it for two white male attorneys discussing how Shermaine Laster should react, how Shermaine Laster, growing up in the projects, how he should be. How arrogant is it for [defense counsel] to come before you and tell you oh, it's an act? (T. 402-03).

Following the summations, Justice Silverman charged the jury on the crimes of murder in the second degree, under both an intentional and depraved indifference theory (see N.Y. Penal Law § 125.25(1) and (2)); manslaughter in the first degree (see N.Y. Penal Law § 125.20(2)); manslaughter in the second degree (see N.Y. Penal Law § 125.15(1)); and criminal possession of a weapon in the second and third degrees (see N.Y. Penal Law §§ 265.03(1)(b) and 265.02(4)). In defining intentional murder for the jury, Justice Silverman stated, "Under our law a person is guilty of murder in the second degree when, with intent to cause the death of another person, he causes the death of such person." (T. 478). However, after defining the term, "intent," the trial court listed the two elements which the prosecution needed to prove beyond a reasonable doubt as follows:

> 1. That on or about April 8[th], 1999 in the County of Kings the defendant, Jerome Howell, did shoot Kenneth Brown, Jr., with a loaded firearm; and
>
> 2. At the time Jerome Howell did so he did so with the intent to causes [*sic*] the death of Kenneth Brown, Jr (T. 479).

The prosecution immediately alerted the court that the victim's name was Baker, not Brown (T. 479), but defense counsel made no objection to the charge. The court then repeated the charge, saying:

> [L]et me do that again. That on or about April 8[th], 1999 in the County of Kings the defendant, Jerome Howell, shot Kenneth Baker, Jr., with a firearm; and
>
> 2. That at the time he did so he did so with the intent to cause the death of Kenneth Baker (T. 479).

Defense counsel again did not object.

As requested by defense counsel, the trial court subsequently instructed the jury on intoxication and the affirmative defense of extreme emotional disturbance. With respect to the former, the Court told the jury that intoxication was not a defense, but could be "considered ... in determining whether a defendant in fact possessed the requisite intent" (T. 483). With respect to the latter, the court instructed that if the jury found the defendant had proven extreme emotion disturbance by a preponderance of the evidence, the jury could not find defendant guilty of murder in the second degree and would have to find him guilty of manslaughter in the first degree (T. 482-83).

Judge Silverman charged the jury on the morning of June 1, 2000. The jury returned a verdict later that same day, finding petitioner guilty of the top count: murder in the second degree in violation of New York Penal Law § 125.25(1) (T. 502). On June 19, 2000, Justice Silverman sentenced petitioner to the maximum sentence permissible for that Class A-II felony:

13

an indeterminate sentence with a minimum of 25 years and a maximum of life imprisonment (S. 8).

### Petitioner's Direct Appeal

The sole issue raised on petitioner's direct appeal related to Justice Silverman's instructions on the intentional murder charge. Appellate counsel argued that Justice Silverman "failed to charge that the People must prove beyond a reasonable doubt that [the defendant] caused the complainant's death." Brief for Defendant-Appellant, dated November 2003, at p. 18. The prosecution responded with a three-part analysis. First, the prosecution noted that petitioner's trial counsel had not objected to the intentional murder charge and that petitioner's claim was, therefore, unpreserved for appellate review. Second, the People argued that Justice Silverman's charge, when considered as a whole, conveyed the correct standard, since he had stated that one must have caused the death of another to be guilty of intentional murder. Third, the prosecution argued that any error was harmless, since the uncontroverted testimony of two medical experts established that Baker had died from sepsis caused by the gunshot wounds.

On October 12, 2004, the Appellate Division of the Supreme Court of the State of New York, Second Department, affirmed petitioner's judgment of conviction. *People v. Howell*, 11 A.D.3d 560, 782 N.Y.S.2d 642 (N.Y. App. Div. 2004). The Appellate Division held that petitioner had "failed to preserve his contention that the Supreme Court gave an insufficient jury charge with respect to murder in the second degree." *Id.* However, the Court also ruled that petitioner's contention was "without merit," finding that "[t]he charge, as a whole, adequately conveyed to the jury all of the elements of murder in the second degree." *Id.* The Appellate Division concluded that the "challenged charge did not deprive [petitioner] of a fair trial. *Id.*

14

Howell applied for permission to appeal the charge issue to the New York Court of Appeals. However, by Order dated December 8, 2004, the Court of Appeals denied petitioner's leave application. *People v. Howell*, 4 N.Y.3d 744, 790 N.Y.S.2d 657 (2004). Petitioner did not petition the United States Supreme Court for a writ of certiorari. As a result, the judgment of conviction became final in early March 2005.

### *The Original Petition*

On October 17, 2005, petitioner commenced this action by placing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the mailbox at Sing Sing Correctional Facility. That submission, which consisted of a completed form petition (the "Petition") and a 10-page memorandum of law (the "Memorandum"), raised the same issue that petitioner had exhausted upon his direct appeal: "Whether the trial Court's instructions on the elements of Murder in the Second Degree, which failed to charge that the [P]eople must prove beyond a reasonable doubt that [petitioner] caused the death of the complainant[, a]n element which was not conceded by the defense, deprived [petitioner] of a fair [trial]." Petition, ¶ 12.

In early December 2005 – less than two months after the commencement of this action – petitioner wrote this Court a letter, requesting that this action be held in abeyance in order to permit him to "submit a 440.10 motion in the state court." *See* Letter to United States District Court from Jerome Howell, dated Dec. 6, 2005, at 1. However, because that letter had not been served on respondent, this Court denied petitioner's request on procedural grounds, stating, "Petitioner must serve Respondent with any submissions to the Court or the Court will not consider the request." *See* Order dated Dec. 29, 2005, endorsed on petitioner's Dec. 6, 2005, letter.[3]

---

[3]By letter dated February 13, 2006, petitioner – apparently unaware that his request to hold these proceedings in abeyance had already been denied – asked to withdraw that request, stating that he had been involved in a fight with the inmate who was helping him with his State court motion.

On March 8, 2006, respondent Brian Fisher filed his response, essentially repeating the same arguments that the prosecution had raised on direct appeal. Specifically, respondent argued that the sole ground raised in the Petition was procedurally barred, that the ground lacked merit because the trial court's instruction was adequate, and that any error in the charge was, in any event, harmless in view of the overwhelming evidence that petitioner caused Baker's death. In mid-April 2006, petitioner replied by filing a "Traverse," addressing issues raised by respondent.

Less than a month after filing his "traverse," however, petitioner requested that this Court "reconsider" his motion to hold his petition in abeyance. *See* Letter to Hon. Clerk from Jerome Howell, dated May 10, 2006. In that letter, petitioner implied that he wished to raise two additional issues: ineffective assistance of trial counsel and ineffective assistance of appellate counsel. *Id.* However, petitioner did not explain why he had failed to raise the issues earlier or discuss the merits of his ineffective assistance claims.

This Court construed petitioner's May 10, 2006, letter as a request for reconsideration of petitioner's December 2005 application for a stay. Noting that the December 2005 application had been denied solely because petitioner had not served it on respondent, this Court denied the request for reconsideration, but noted that petitioner was free to renew his stay application. *See Howell v. Fisher*, No. 05-CV-5216 (SLT), slip op. at 3 (E.D.N.Y. May 25, 2006). In a Memorandum and Order dated May 25, 2006, this Court not only explained the manner in which *Rhines v. Weber*, 544 U.S. 269 (2005), had changed the "stay and abeyance" procedure in habeas cases, but advised petitioner to consider whether his new claims would "relate back" to the original petition or be time-barred. *See id.* at 2-3 (citing *Mayle v. Felix*, 545 U.S. 644 (2005)).

16

In response to this Court's May 25, 2006, order, petitioner sent a letter dated June 30, 2006, advising the Court that he had both filed a motion pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 and petitioned for a writ of error coram nobis. Letter to Hon. Judge Townes from Jerome Howell dated June 30, 2006. However, petitioner implied that he could not make the showing required under *Rhines*, and stated that he "would not be bringing those issues (presumably, the issues raised in his state court motions) any further then [*sic*] state level." *Id.*

As explained below, petitioner later changed his mind and sought to amend his habeas petition to raise issues contained in his two post-conviction motions. Accordingly, it is necessary to discuss the substance and the procedural history of these motions.

**Petitioner's Post-Conviction Motions**

In his C.P.L. § 440 motion, petitioner principally argued that his trial counsel "never bothered to conduct an investigation ...." Argument in Support of C.P.L. § 440 Motion ("Petitioner's Argument") at ¶ 4. Asserting that all of the witnesses who testified at trial "stated that there was a large crowd present," *id.*, at ¶ 16 (emphasis omitted), petitioner speculated that if trial counsel had "bothered to ... investigate," he could have found witnesses who "very likely would have been able to provide testimony that could have clearly undermined the People's theory that [he] 'Intentionally Killed' Kenneth Baker, Jr. *Id.*, at ¶ 7. Petitioner also alleged that, had trial counsel "performed a minimal investigation," he would have "learned that ... Adrian ... was shot in the same fashion as was the victim," while "trying to disarm [petitioner]." *Id.*, at ¶ 19. Claiming that Laster "would have this [Court] believe that he was standing right next to [Adrian]," petitioner argued that his brother "could have also attested to the fact that Shermaine Laster ... was not even present during the actual shooting." *Id.*, at ¶ 20. In addition, petitioner

17

claimed that, if his trial attorney had visited the crime scene or had an investigator do so, he "would have seen first hand that the light in the area of the incident were not working" and would have been better able to cross-examine the witnesses at trial. *Id.*, at ¶¶ 24-25.

Petitioner did not attach an affidavit from his brother to his C.P.L. § 440 motion. However, petitioner's Affidavit in Support of the C.P.L. § 440.10 Motion ("Petitioner's Affidavit") included excerpts allegedly taken from Adrian Howell's grand jury testimony. In these excerpts, Adrian stated, in substance, that he arrived at the scene after Baker had been shot; that he attempted, along with others, to wrest the gun from petitioner; and that he was shot in the process. Petitioner's Affidavit at 20.[4] Adrian also told the grand jury that petitioner had been "drunk." *Id.* Petitioner claimed that the latter was corroborated by grand jury testimony from a person named "Nieves," who allegedly testified that petitioner was "pissy drunk" at the time of the fistfight with Baker. *Id.*, at 19 (emphasis omitted). Petitioner, who claimed that he had formulated the intent "to scar[e Baker] and at worst to shoot him in the leg" at the time of the shooting, Petitioner's Argument at ¶ 33, alleged that Adrian's testimony would have influenced the outcome of the case by persuading the jury to find him guilty of manslaughter in the second degree rather than murder in the second degree. Petitioner's Affidavit at 4.

Petitioner's C.P.L. § 440 motion also faulted trial counsel for failing to adequately interview petitioner's mother or to call her to testify at his trial. Petitioner alleged that his mother told his lawyer that she "had important information that she wished to discuss with him," but that his attorney never returned her calls. Petitioner's Affidavit at 3. Petitioner also alleged

---

[4]Although this affidavit is not paginated, this Court assumes that the first page of the affidavit is the page bearing the caption and the heading, "Affidavit in Support of C.P.L. 440.10(1)(h)," and deems the subsequent pages to be number sequentially.

that trial counsel not only misled him to believe that he intended to call petitioner's mother to testify, but even excluded her from the courtroom because she was a potential witness. *Id.* However, petitioner did not provide an affidavit from his mother to substantiate this assertion or to explain the nature of the "important information" she intended to share with counsel.

In addition, petitioner asserted that his trial counsel never spoke with him outside of court and, thereby, denied petitioner the opportunity to assist in his own defense. Petitioner's Argument at ¶¶ 4-5. Petitioner "believe[d] it was vital for [defense counsel] to interview [him]" for two reasons. *Id.*, at ¶ 6. First, petitioner could have informed his trial lawyer that neither Laster nor St. Louis was present during the incident. *Id.* Second, petitioner could have given his lawyer his version of events.

Petitioner's version of events was set forth in separately numbered 20-paragraph section of Petitioner's Affidavit, entitled: "The Following is What I Wanted to Explain to Trial Counsel[] and if Given the Opportunity to Testify Before this Court." In this section, petitioner stated that, on the evening of April 8, 1999, he was drinking and smoking with friends, who were competing to see who could collect the most telephone numbers from women in a day. Petitioner attempted to obtain numbers from three women without realizing their connection to Baker. Baker, upset by petitioner's behavior, started a fight, which petitioner lost. Feeling "[h]umiliated yet again," petitioner encountered his brother, who gave him a gun and instructed him to "take care of business." Petitioner stalled for time by telling his brother he had to go home to use the bathroom, and then argued with his brother in order to make his mother intervene. However, petitioner's brother pulled petitioner from his mother's arms and threatened petitioner. Coerced by those threats, petitioner confronted Baker, intending to "frighten him ... by shooting him in the leg." Petitioner admitted firing the gun once – although he believed he

19

missed – and subsequently wrestled with Baker for possession of the weapon. Petitioner recalled that "[s]everal shots were fired," but claimed to have "absolutely no recollection of who was shot or how many times."

Finally, petitioner's § 440 motion objected to specific actions his trial counsel took during trial. First, petitioner faulted his lawyer for failing to object to that portion of the People's opening in which the prosecutor stated that the jury would "hear in the defendant's own words" about certain portions of the incident. Petitioner's Affidavit at 11. Petitioner alleged that this comment "clearly shifted the burden of proof back to the defendant right at the beginning of trial [a]nd denied [him] ... the right to remain silent." *Id.* Second, petitioner alleged that his counsel failed to cross-examine various prosecution witnesses, including the emergency room physician, Dr. Blumenthal, and Police Officer Smith. Third, petitioner claimed that his lawyer failed to present adequate evidence of petitioner's intoxication and never argued the intoxication defense to the jury, even though he requested that the intoxication charge be given.

In a Decision and Order entered April 10, 2007, Justice Cheryl E. Chambers denied petitioner's C.P.L. § 440.10 motion. Justice Chambers concluded that petitioner was essentially disagreeing with his counsel's losing trial strategy, which was "to challenge the voluntariness of [petitioner's] statement ... and to impeach the credibility of the People's eyewitnesses." *See People v. Howell*, Ind. No. 5158/99, slip op. at 4 (N.Y. Sup. Ct., Kings County, Apr. 10, 2007). Justice Chambers found that the trial strategy employed by petitioner's counsel was one "that might well have been pursued by a reasonably competent attorney," and was "actively supported by [petitioner] at trial." *Id.*, at 5. Justice Chambers noted that petitioner had expressly declined to testify at trial, and had "assured the trial court that he freely chose not to testify after discussing it with his attorney." *Id.*, at 4. In addition, Justice Chambers noted that petitioner had

not explained what testimony his mother, who was not an eyewitness to the shooting, might have given that would have benefitted him. *Id.*, at 4-5. On June 25, 2007, the Court of Appeals denied petitioner's application for leave to appeal Justice Chamber's order. *People v. Howell*, No. 2007-4070, 238 N.Y.L.J. 29, col. 5 (July 2, 2007).

In his petition for a writ of error coram nobis, petitioner argued that his appellate counsel did not provide effective assistance because he failed "to raise on direct appeal that trial counsel was ineffective" in failing to make two objections. Petitioner's Affidavit in Support of a Petition for a Writ of Error Coram Nobis ("Petitioner's Coram Nobis Affidavit") at 2. First, petitioner asserted that his trial counsel was ineffective because he failed to object to the charge on intentional murder in the second degree. Although he acknowledged that the Appellate Division had discretion to reach unpreserved issues in the interests of justice, petitioner asserted that "[c]ounsel's assumption that this court would grant relief in the interest of justice was a 'bad call.'" Petitioner's Coram Nobis Affidavit at 9 (emphasis in original). Second, petitioner implied that appellate counsel should have raised a prosecutorial misconduct argument, claiming that the prosecutor improperly argued in summation that neither he nor defense counsel, as Caucasians, could explain or understand why Laster – an African-American man from the projects – failed to contact the police after witnessing the murder.

On October 24, 2006, the Appellate Division of the Supreme Court of the State of New York, Second Department, denied petitioner's application for a writ of error coram nobis. The Court held, without further elaboration, that petitioner "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Howell*, 33 A.D.3d 939, 939, 822 N.Y.S.2d 459, 459 (N.Y. App. Div. 2006). On December 19, 2006, the New York Court of Appeals

21

denied petitioner's application for leave to appeal this Appellate Division decision. *People v. Howell*, 7 N.Y.3d 926, 827 N.Y.S.2d 694 (2006).

### Petitioner's Motion to Amend his Habeas Petition

On May 7, 2007 – approximately one month after petitioner's C.P.L. § 440 motion was denied by Justice Chambers and five months after the New York Court of Appeals denied petitioner's application for leave to appeal the denial of his petition for a writ of error coram nobis – petitioner renewed his application for a stay. However, before this Court could rule on that application, it was rendered moot by the Appellate Division's decision to deny leave to appeal the C.P.L. § 440 motion – a decision which exhausted petitioner's state remedies. On July 27, 2007, petitioner wrote another letter, attaching a copy of the Appellate Division's decision and expressly requesting leave to amend his petition.

By order dated July 31, 2007, this Court construed petitioner's letters as a motion to amend the Petition pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Although this Court set a briefing schedule for the motion, respondent elected not to oppose the motion. *See* ADA Morgan J. Dennehy's Affidavit in Response to Motion to Amend Petition, dated Aug. 9, 2007, at ¶ 4. Accordingly, this Court granted permission to amend the petition. *Howell v. Fisher*, No. 05-CV-5216 (SLT), slip op. at 1 (E.D.N.Y. Aug. 23, 2007).

### The Amended Petition

On August 31, 2007 – almost two and one-half years after petitioner's conviction became final – petitioner filed his amended petition. That "Amended Petition" raised two grounds for relief. First, the Amended Petition alleged that petitioner "was deprived [of] effective assistance of appellate counsel on direct appeal [by] appellate counsel's failure to object to the court's charge to the jury." Amended Petition at 6. Second, the Amended Petition asserted, without any

22

factual elaboration, that petitioner had been denied "the right to be represented by effective

assistance of trial counsel[], as required by the Strickland standard guaranteed under the Sixth

and Fourteenth Amendment[s]." *Id.* at 7. The Amended Petition made no mention of the sole

ground raised in the original Petition: namely, the claim that petitioner had been denied a fair

trial by the failure to charge the jury on the causation element of intentional murder.

In his response, respondent does not contest the timeliness of the amended grounds or

argue that they are procedurally barred, but urges this Court to deny the Amended Petition on the

merits. Respondent assumes that petitioner "misstate[d] his ineffective assistance of counsel

claim," and that petitioner intended to raise the issues contained in his petition for a writ of error

coram nobis. ADA Morgan J. Dennehy's Affidavit in Opposition to Amended Petition, dated

Sept. 25, 2007, at ¶ 19 and n. 1. Respondent also assumes, in light of petitioner's *pro se* status,

that petitioner's second ground raises the same issues contained in the C.P.L. § 440 motion. *Id.*

## DISCUSSION

### The Timeliness of Petitioner's Ineffective Assistance Claims

There is no question that petitioner's original Petition, raising a single charge issue, was

timely. Because petitioner did not seek a writ of certiorari in the United States Supreme Court,

his conviction became final on March 8, 2005 – 90 days after the New York Court of Appeal's

December 8, 2004, decision denying petitioner leave to appeal. *See Williams v. Artuz*, 237 F.3d

147, 150-51 (2d Cir. 2001). The original Petition was filed on October 17, 2005, when petitioner

placed the Petition in his prison mailbox. *See, e.g.*, *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir.

2001) (applying the "prison mailbox rule" announced in *Houston v. Lack*, 487 U.S. 266 (1988),

to determine the date on which federal habeas corpus petitions were filed). Therefore, the

original Petition was filed well within one year of the date on which petitioner's conviction became final. *See* 28 U.S.C. § 2244 (d)(1)(A).

There is, however, a substantial question as to whether petitioner's ineffective assistance claims are timely. According to the Amended Petition, petitioner did not even file his C.P.L. § 440 motion or petition for a writ of error coram nobis until June 8, 2006 – 15 months after his conviction became final. Although petitioner claims that he was unable to raise these issues sooner because "trial counsel and appellate counsel both kept [him] ignorant of the law [and] facts of the case," *see* Letter to Judge Townes from Jerome Howell, dated May 7, 2007, at 1, none of the facts on which petitioner's ineffective assistance claims rely appear to be newly discovered evidence. Rather, all of the facts underlying petitioner's ineffective assistance claims were either apparent at the time of trial or could have been discovered through the exercise of due diligence immediately thereafter. *See* 28 U.S.C. § 2244 (d)(1)(D). This Court also has doubts as to whether the ineffective assistance claims would relate back to the original claim, since there does not appear to be a "common 'core of operative facts' uniting the original and newly asserted claims." *Mayle v. Felix*, 545 U.S. 644, 659 (2005). The facts supporting the ineffective assistance claims appear to "differ in both time and type from those the original pleading set forth." *Id.* at 650.

Although this Court could raise the timeliness issue *sua sponte*, it is neither obliged to do so, *see Day v. McDonough*, 547 U.S. 198, 209 (2006), nor prepared to do so under the circumstances of this case. First, respondent has deliberately chosen not to raise this issue, both by electing not to oppose petitioner's motion to amend the petition and by failing to address the timeliness issue in his response to petitioner's Amended Petition. Second, if this

Court were to raise the timeliness issue at this juncture, it would have to "accord the parties fair notice and an opportunity to present their positions." *Id.* at 210. Since this Court concludes, for the reasons set forth below, that the Amended Petition is without merit, this Courts sees no reason to further delay these proceedings by raising the timeliness issue *sua sponte*. Instead, this Court will decide this case on its merits.

### Federal Habeas Corpus Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). An "adjudication on the merits" is a substantive, rather than a procedural, resolution of a federal claim. *See Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (citations omitted). A state court has adjudicated a state petitioner's claim on the merits when it "(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Bell v. Miller*, 500 F.3d 149,155 (2d Cir. 2007) (quoting *Sellan*, 261 F.3d 303 at 312).

Under § 2254(d)(1) – the "contrary to" clause – a federal habeas court may grant the writ "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that reached by the

25

Supreme Court. *Bell v. Cone*, 543 U.S. 447, 452-53 (2005) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)). Under § 2254(d)(2) – the "unreasonable application" clause – a federal habeas court may grant the writ if the state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of the petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)). "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir.2002).

### *Ineffective Assistance of Trial Counsel*

In this case, petitioner argues that he was denied his Sixth Amendment right to effective assistance of counsel by both his trial lawyer and his appellate counsel. *Williams*, 529 U.S. at 412-13. The Sixth Amendment of the United States Constitution ensures that "in all criminal prosecutions, the accused shall ... have the Assistance of Counsel" for his defense. U.S. Const. Amend. VI. Although the Sixth Amendment does not expressly require that counsel be "effective," courts have found that the right to counsel inherently implies the right to effective assistance. As the Second Circuit has noted, the very "purpose of the Sixth Amendment guarantee of 'the Assistance of Counsel' ... is to ensure that defendants have effective assistance of counsel." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotations and citations omitted).

Federal law relating to effective assistance of counsel was clearly established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). That case established a two-

pronged test for deciding ineffective assistance claims. To satisfy the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Specifically, "[a] convicted defendant ... must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690.

To satisfy the second prong, a defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* Further, "[t]he level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" *Linstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 693).

"[A] petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his counsel's strategy." *Singleton v. Duncan*, No. 03-CV-561, 2006 WL 73734, at *14 (E.D.N.Y. Jan. 10, 2006) (citing Jones v. Barnes, 463 U.S. 745, 752 (1983)). Indeed, "determinations regarding the defense strategy adopted at trial" are "[a]mong the 'virtually unchallengeable' tactical decisions left to the judgment of trial counsel." *Gluzman v. United States*, 124 F. Supp. 2d 171, 174 (S.D.N.Y. 2000) (citing *United States v. Simmons*, 923 F.2d 934, 956 (2d Cir.1991)). Therefore, when applying the two-pronged test, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Courts assessing whether counsel was ineffective "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* The burden is on the defendant to "overcome the presumption that, under the circumstances, the challenged

action might be considered sound trial strategy." *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955) (internal quotations omitted)).

"[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy." *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). However, ultimately, "[t]he relevant inquiry focuses 'on the fundamental fairness of the proceeding whose results are being challenged.'" *Bien v. Smith*, 546 F. Supp. 2d 26, 51 (E.D.N.Y. 2008) (quoting *Strickland*, 466 U.S. at 696). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

### Petitioner's Counsel's Trial Strategy

In this case, petitioner's counsel had a well-conceived and readily discernible trial strategy. Although there were at least four eyewitnesses to the events of April 8, 1999, only two of the witnesses who testified for the prosecution both witnessed the shooting and identified the shooter in some manner. The credibility of one of these witnesses – Shermaine Laster – was suspect because Laster was testifying pursuant to a cooperation agreement under which he was to receive a reduced sentence in an unrelated case for testifying in a manner which the prosecution judged to be truthful. Laster conceded that he had not agreed to cooperate with the police until his own defense counsel suggested "that it would be a good idea to testify" (T. 98). Moreover, Laster had known Baker "since he was . . . little" (T. 65) and had "grow[n] fond" of him (T. 69). Accordingly, he had an independent motive to inculpate petitioner who, according to Baker's family, was responsible for Baker's murder.

The other witness was Joann St. Louis, one of the three teenage girls whom petitioner allegedly harassed prior to the shooting. However, St. Louis could not identify petitioner, except to say that she heard his friends refer to him as "Rome" (T. 299, 314-15, 322). In addition, her account of the shooting differed substantially from Laster's. It also differed from Murray's in that St. Louis claimed to have run from the scene with Murray, while Murray claimed to have been in her bedroom at the time of the shooting.

Recognizing the weakness of this identification testimony, petitioner's counsel elected to pursue a misidentification defense. As the trial court correctly noted in its order denying petitioner C.P.L. § 440 motion, defense counsel's strategy was to challenge the voluntariness of Howell's confession and to impeach the credibility of the State's witnesses. In his summation, defense counsel first argued that petitioner's statements were neither voluntary nor truthful, questioning why someone who fled all the way to North Carolina would confess so quickly and asserting that the statements attributed to petitioner made "no sense at all compared to the evidence in this case" (T. 387). Defense counsel then analyzed the testimony of Laster and St. Louis. He dismissed the former as "bought and paid for" (T. 388). He discredited the latter by noting that St. Louis had identified someone other than petitioner at the lineup (T. 396), and had claimed to be with Murray, who was upstairs at the time of the shooting (T. 395).

### *Petitioner's Arguments for Ineffective Assistance of Trial Counsel*

In this case, petitioner argues that his trial counsel's representation fell below an objective standard of reasonableness in several respects. First, petitioner argues that trial counsel never "interviewed him" or visited him in jail prior to or during the trial. Second, petitioner argues that his trial counsel did not perform an adequate pre-trial investigation.

29

Specifically, petitioner asserts that his lawyer (1) never visited the crime scene or hired an investigator who could have unearthed eyewitnesses who would have negated the People's evidence of intent, (2) never returned his mother's calls and never called her as a witness at trial, and (3) never interviewed or called petitioner's brother, Adrian, as a witness. Third, petitioner claims that his trial attorney made several errors at the trial itself. Petitioner contends that counsel should have (1) objected to that portion of the People's opening statement in which the prosecutor promised that the jury would hear from petitioner "in his own words," (2) cross-examined various prosecution witnesses, including Dr. Blumenthal and Police Officer Smith, and (3) specifically argued the intoxication defense during summation. For ease of analysis, this Court will address petitioner's contentions in reverse order.

### Counsel's Performance at Trial

Trial counsel's performance at trial did not fall below an objective standard of reasonableness. First, there was nothing objectionable about the prosecutor's opening statement. Although the prosecutor repeatedly promised the jury that they would hear about certain events of April 8, 1999, in petitioner's "own words" (T. 18, 24) or from petitioner's "own mouth" (T. 23-24), the prosecutor was referring to portions of statements that petitioner himself had made to the police. Despite defense counsel's efforts to suppress those statements, which resulted in a pre-trial hearing on May 22, 2000, the Court denied the suppression motion. Accordingly, there was nothing to prevent the prosecutor from admitting these statements at trial, or from previewing this evidence in his opening statement.

The rhetorical flourish used by the prosecutor in discussing petitioner's statements did not serve to shift the burden to petitioner or deprive him of his right to remain silent. Indeed,

petitioner elected not to testify at trial and defense counsel argued in his summation that the petitioner's statements were not voluntarily made.

Second, there was nothing improper about defense counsel's decision not to cross-examine Police Officer Smith and Dr. Blumenthal. Police Officer Tony Smith, one of the first police officers to arrive at the shooting scene, testified solely about his role in securing the scene and vouchering evidence. The officer was not responsible for questioning prospective witnesses or investigating the crime, and petitioner has not suggested what probative evidence could have been adduced from this witness on cross-examination.

Dr. Blumenthal, who was the chief of the trauma service at the hospital to which Baker was taken following the shooting, testified concerning the medical treatment Baker received and opined that Baker's death resulted from his gunshot wounds (T. 214-24). This testimony was not controverted, and petitioner has not suggested any basis on which his attorney could have cross-examined the doctor. Although petitioner notes that the doctor testified that Baker died of a heart attack after contracting sepsis as a result of the gunshot wounds, Petitioner's Affidavit at 8, it would have been futile for defense counsel to attempt to establish that Baker had not died as a result of the shooting. Under New York law, a person "'causes' the death of another when he 'sets in motion the events which ultimately result in the victim's death.'" *Powell v. Phillips*, No. 05 Civ. 3537 (DLC), 2009 WL 929538, at *11 n. 9 (S.D.N.Y. Apr. 7, 2009) (quoting *People v. Matos*, 83 N.Y.2d 509, 511, 611 N.Y.S.2d 785, 785 (1994)). This definition of causation is very broad. *See, e.g., People v. Velez*, 159 Misc.2d 38, 43, 602 N.Y.S.2d 758, 761-62 (N.Y. Sup. Ct., Bronx County 1993) (holding that a gunman caused the death of a person who was rendered unable to ingest food orally by the gunshot wound he

31

suffered but who effectively committed suicide in the hospital by refusing nourishment and medical treatment).

Third, there was nothing improper about defense counsel's decision to request a charge on intoxication, but not to argue that petitioner was intoxicated. As noted above at pp. 28-29, defense counsel's strategy was to argue that petitioner had been misidentified as the shooter and, thereafter, coerced into confessing to the crime. An argument that petitioner was so intoxicated as to be unable to formulate an intent to kill at the time he shot Baker would have been inconsistent with this misidentification defense. "Failure to raise an intoxication defense that is inconsistent with other defenses is not sufficient to support an ineffectiveness claim." *Santos v. Greiner*, No. 99 Civ. 1545 AJP, 1999 WL 756473, at *10 (S.D.N.Y. Sept. 24, 1999) (citing cases).

Although defense counsel would not have been ineffective had he simply not raised the intoxication defense, defense counsel implicitly recognized that the decision not to argue in the alternative did not mandate abandonment of the intoxication claim. Under New York law, "[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis." *People v. Perry*, 61 N.Y.2d 849, 850, 473 N.Y.S.2d 966, 966-67 (1984). In deciding whether to charge on intoxication, the relevant inquiry for a court is "not whether the claimed defense was consistent with the defendant's testimony or with other defenses raised, but whether that defense, viewed separately, was supported by the trial evidence." *See People v. Butts*, 72 N.Y.2d 746, 750, 536 N.Y.S.2d 730, 733 (1988). Therefore, counsel could request a charge on intoxication, even though that charge was inconsistent with the defense put forth at trial. *See id.*, 72 N.Y.2d at 750.

Under the circumstances of this case, the decision to not to argue intoxication, but to nonetheless ask for the intoxication charge, was entirely reasonable. Defense counsel's cross-examination of the People's witness produced some evidence of intoxication, but that evidence was equivocal. For example, Murray testified that she saw a marijuana cigarette tucked behind petitioner's ear and "thought *maybe* he was high off of weed" (T. 244) (emphasis added). Similarly, St. Louis testified that she "smelled alcohol on [petitioner's] breath and also weed," and saw petitioner smoking and drinking prior to the fight with Baker (T. 316, 319), but did not testify concerning the degree of petitioner's intoxication. Moreover, this equivocal evidence was undercut by Laster's testimony that petitioner was riding his bicycle "perfectly fine" just prior to the shooting (T. 117).

In light of the weakness of the intoxication argument, defense counsel acted reasonably in choosing not to expressly argue intoxication. By asking for the intoxication charge, defense counsel managed to put the issue before the jury without having to raise it explicitly. Through this maneuver, defense counsel ensured that the jury would consider the intoxication defense, without having to undercut his misidentification claim by arguing in the alternative.

### Counsel's Pre-Trial Investigation

Although strategic decisions made by counsel after "thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," even strategic choices made "after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*, at 691. In assessing the reasonableness of counsel's decision not to investigate, a court must take into

account "all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

In this case, petitioner's claims that defense counsel failed to conduct an adequate pre-trial investigation are not substantiated by competent evidence. Although petitioner submitted an affidavit in which he represented that counsel failed to interview his mother and brother, petitioner lacked personal knowledge of the interactions between his family and his attorney. Petitioner never provided affidavits from either his mother or brother indicating what, if any, contact they had with defense counsel or what testimony they had to offer.

In the absence of this evidence, it is unclear what information, if any, defense counsel had concerning the mother's and brother's involvement in the incident. It is also unclear what "important information" petitioner's mother may have had or precisely what testimony, if any, either the mother or brother would have given. In the absence of proof clarifying these matters, petitioner cannot sustain his burden of proving that counsel acted unreasonably in not contacting the brother or mother or in failing to call them as witnesses. In addition, petitioner cannot show that there is a reasonable probability that the outcome of the trial would have been different had counsel interviewed them.

Even if this Court were to assume that petitioner's brother was prepared to testify in a manner consistent with his grand jury testimony and that petitioner's mother was prepared to testify in a manner consistent with petitioner's own account of the incident, the outcome of the proceedings would not have been affected had defense counsel interviewed these witnesses. Both accounts would have contradicted trial counsel's misidentification strategy. Although petitioner's brother claimed that he did not witness the shooting itself, he testified that he attempted to wrest the gun from his brother immediately after the shooting. Petitioner's

34

mother also did not witness the shooting, but her testimony – if consistent with petitioner's account – would have established petitioner's motive for the shooting and how petitioner obtained the gun. Indeed, her testimony would have been particularly damaging because it undercut the intoxication claim by suggesting that petitioner had the presence of mind to go home and start an argument with his brother in order to make his mother intervene. Therefore, even if petitioner's trial counsel had known of the brother's and mother's accounts, he is unlikely to have called either to testify.

Defense counsel's strategic decision to pursue a misidentification defense also explains why counsel elected not to request an investigator to canvass for potential witnesses. First, even assuming that petitioner is correct in asserting that an investigator could have unearthed eyewitnesses who could have negated the People's evidence of intent, these witnesses could not have furthered the misidentification defense. Since petitioner's confession indicated that he was the gunman – a fact which petitioner now readily admits – defense counsel could anticipate that identifying additional witnesses to the shooting would undermine the misidentification argument by providing additional evidence of petitioner's involvement. For that reason, defense counsel elected not to call Nieves, notwithstanding the fact that his testimony that petitioner was "pissy drunk" would have bolstered petitioner's intoxication claim. Nieves would have also testified that petitioner was the shooter, which would have undermined the misidentification defense.

### *The Failure to Interview Petitioner*

Although Petitioner's Argument states that trial counsel "never bothered to .... interview" petitioner, and never visited him in jail, *id.*, at ¶¶ 4, 6, this allegation is not contained in Petitioner's Affidavit. Moreover, there are reasons to doubt the veracity of that

assertion. After defense counsel announced, outside the presence of the jury, that he would not be calling any witnesses, Judge Silverman questioned petitioner in open court. Petitioner did not express any dissatisfaction with counsel, his preparation, or his strategic choices. Rather, petitioner stated that he *had* discussed his right to testify with counsel, and had agreed not to testify (T. 366). There is nothing to suggest that petitioner complained at any time during or after trial about counsel's failure to interview him. Notably, in his petition for a writ of error coram nobis, petitioner did not even mention defense counsel's failure to interview him as among the failures that could have been raised by appellate counsel in arguing ineffective assistance of trial counsel.

Even assuming that trial counsel failed to interview petitioner prior to trial, petitioner has not established that this failure affected the outcome of the trial. Although petitioner asserts that it was "vital for [defense counsel] to interview [him]," Petitioner's Argument at ¶ 6, the only concrete reasons offered by petitioner to substantiate this assertion are that an interview would have permitted petitioner (1) to give counsel his version of events and (2) to inform counsel that he saw neither Laster nor St. Louis during the shooting. However, for the same strategic reasons discussed above, petitioner's information concerning the incident would not have been helpful to defense counsel.

First, both petitioner's version of events and his claim that he saw neither Laster nor St. Louis at the time of the shooting were inconsistent with defense counsel's misidentification defense. Petitioner's version of events conceded that he was the shooter, but suggested that the shooting might have been accidental and that petitioner had not intended to kill Baker. However, petitioner's claims that shots were accidently fired in the course of a struggle over the gun were not only contrary to eyewitness accounts of the shooting, but contradicted by

36

ballistics evidence indicating that the gun was not an automatic, but a semi-automatic, weapon and could not be fired repeatedly by simply depressing the trigger once. Moreover, while evidence that petitioner had intended to shoot, but not kill, petitioner might have persuaded a jury to acquit him of intentional murder, it offered no defense to the depraved indifference theory advanced by the prosecution.

Petitioner's version of events also undercut his intoxication claim. Although petitioner alleged that he was "'stoned' out of [his] mind" on the evening of April 8, 1999, Petitioner's Affidavit at 16, he claimed that he nonetheless concocted an excuse to go home and managed to involve his mother in his argument with his brother, who was insisting that petitioner avenge himself.

Finally, even if petitioner had told his counsel his version of events and that he did not see Laster or St. Louis at the crime scene, there is no reason to believe that counsel would have changed his trial strategy. First, petitioner's testimony that he had not seen Laster or St. Louis at the scene was virtually useless, since petitioner might easily have failed to spot these witnesses among the large crowd who witnessed the shooting. Second, even assuming that the jurors credited petitioner's version of events, petitioner would still have been found guilty of at least manslaughter in the second degree. If the misidentification argument had resonated with a single juror, on the other hand, petitioner would not have been found guilty of any crime.

### Ineffective Assistance of Appellate Counsel

Petitioner also claims that his appellate counsel was ineffective because he failed to raise the claim that petitioner's trial counsel was ineffective. In addressing ineffective assistance of appellate counsel, courts utilize the same *Strickland* two-pronged test that is used in cases alleging ineffective assistance of trial counsel. *See Claudio v. Scully*, 982 F.2d 798,

803 (2d Cir. 1992). A petitioner may establish ineffective assistance by demonstrating that counsel failed to raise significant and obvious issues and instead chose to set forth significantly weaker arguments. *See Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000). However, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Id.* (citing *Jones*, 463 U.S. at 754). Accordingly, when reviewing the performance of appellate counsel, courts should refrain from "second-guess[ing] reasonable professional judgments and impos[ing] on ... counsel a duty to raise every colorable claim on appeal." *Jackson*, 162 F.3d at 85 (internal quotations and citation omitted).

In petitioner's case, appellate counsel raised a single, but substantial, issue relating to the court's charge on intentional murder, the most serious crime of which petitioner was convicted. Appellate counsel correctly noted that, in listing the elements of this crime, the trial court did not require the jury to find beyond a reasonable doubt that petitioner caused Baker's death, which is an element of the crime. *See* N.Y. Crim. Jury Instructions 2d for Penal Law § 125.25(1) (available at http://www.mycourts.gov/cji). Rather, the court implied that the prosecution could establish causation by proving beyond a reasonable doubt that petitioner shot Baker. Although the Appellate Division eventually ruled that the charge, as a whole, communicated the correct standard, *see Howell*, 11 A.D.3d at 560, appellate counsel's argument correctly identified a defect in the charge and advanced a substantial argument.

In arguing that appellate counsel provided ineffective assistance, petitioner argues that counsel should have argued ineffective assistance of trial counsel based on trial counsel's failure to object to the charge on intentional murder and his failure to object to a portion of the prosecution summation. However, petitioner's proposed ineffective assistance argument was

38

clearly without merit. First, trial counsel's failure to object to the charge did not effect the outcome of the case. Although the Appellate Division held that the alleged charge error was unpreserved, it nonetheless addressed the merits of the issue and found that other portions of the charge communicated the correct standard. *See Howell*, 11 A.D.3d at 560.

Second, the comment in the prosecution's summation to which petitioner objects was unobjectionable in that it was responsive to arguments in defense counsel's summation. Defense counsel commented on the fact that Laster had cried "like a baby" on the stand, asserting that it was not genuine emotion but an act calculated to "sell" concocted testimony (T. 391). Defense counsel also pointed out that Laster had not cooperated with the police in this case until Laster himself was arrested on unrelated charges, and rebutted the implication that Laster was concerned for his safety by noting that Laster was not in protective custody (T. 388-91). In response, the prosecutor questioned whether either he or defense counsel – "two white males in suits," without experience "in the projects" – were qualified to assess Laster's motivations. The prosecutor stated:

> I submit to you that there was no act going on up there when he [Laster] was testifying. He was testifying about Kenneth Baker, Jr. This was a kid he knew. Based upon the way he testified and what he testified to, it was clear that he had a fondness for this kid Kenny, it's clear that he loved this kid. It's easy to sit here in the cold of the courtroom, 13 months later, two white males in suits talking about Shermaine Laster from the Walt Whitman Houses. Ironic isn't the word. There was another word I was looking for, how ridiculous is it for two white male attorneys discussing how Shermaine Laster should react, how Shermaine Laster, growing up in the projects, how he should be. How arrogant is it for [defense counsel] to come before you and tell you oh, it's an act? (T. 402-03)

Although petitioner attempts to cast these comments as an attempt to introduce racial considerations, the prosecution was not suggesting that defense counsel's arguments be

rejected simply because defense counsel was Caucasian. After all, the prosecutor was himself Caucasian. Instead, the prosecutor was merely suggesting that defense counsel might be unable to empathize with Laster, because he lacked the perspective of someone "growing up in the projects."

Even assuming that the prosecutor's comments were improper, they were not so improper as to deprive petitioner of his due process right to a fair trial. Indeed, petitioner has not argued that appellate counsel was ineffective in failing to make a prosecutorial misconduct argument based on this summation. Defense counsel's failure to object to the prosecutor's comments did not affect the outcome of the case and, therefore, do not provide a basis for arguing ineffective assistance of counsel.

Moreover, if petitioner's appellate counsel had elected to argue ineffective assistance of trial counsel, that complex and fact-intensive argument would have overshadowed the much simpler, but far more substantial, charge argument. Since this "frivolous argument may well have distracted from [the] other, more meritorious issue[] urged by appellate counsel," appellate counsel's decision not to argue ineffective assistance of trial counsel was "not ineffective, but prudent." *See Brunson v. Tracy*, 378 F. Supp. 2d 100, 113 (E.D.N.Y. 2005) (bracketed material added). Accordingly, petitioner's ineffective assistance of appellate counsel argument is also without merit.

### *CONCLUSION*

For the reasons set forth above, the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied and this case is dismissed. Since petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability is granted with respect to either of petitioner's claims. *See* 28 U.S.C. § 2253(c)(2); *Lozada v.*

*United States*, 107 F.3d 1011, 1017 (2d Cir. 1997) (discussing the standard for issuing a

certificate of appealability), *abrogated on other grounds in United States v. Perez*, 129 F.3d

255, 259-60 (2d Cir. 1997).

      SO ORDERED.


SANDRA L. TOWNES
United States District Judge

Dated: July 2 , 2009
      Brooklyn, New York